HARRY ELEUTERI, *ET ALS.*, PLAINTIFFS-APPELLANTS, v. GROVER C. RICHMAN, JR., ATTORNEY-GENERAL OF NEW JERSEY AND MARTIN QUEENAN, BURLINGTON COUNTY PROSECUTOR, DEFENDANTS-RESPONDENTS.

Argued March 4, 1958—Decided April 28, 1958.

*Mr. James M. Davis, Jr.,* argued the cause for plaintiffs-appellants (*Messrs. Powell and Davis,* attorneys).

*Mr. David D. Furman,* Deputy Attorney-General of New Jersey, argued the cause for defendants-respondents (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney; *Mr. David D. Furman,* of counsel; *Mr. Harold J. Ashby,* Deputy Attorney-General, on the brief).

The opinion of the court was delivered by

WEINTRAUB, C. J.  On August 22, 1954, a member of the New Jersey State Police applied to the magistrate of the Municipal Court of Chesterfield Township for search warrants.  His affidavits alleged just and reasonable cause to believe that gaming was taking place in violation of *N. J. S.* 2A:112–3.  The premises were described respectively as 134 Second Street in the City of Bordentown and 54 East Main Street in the Township of Mansfield.  The search warrants issued and were executed.

Plaintiffs filed a complaint in the Chancery Division of the Superior Court seeking among other things to suppress the product of the raids.  Both plaintiffs alleged illegality in that (1) the magistrate was without authority to issue a warrant for a search beyond the territorial limits of his court; (2) no authority exists for a warrant in connection with gambling; and (3) the warrants do not "particularly" describe the papers and things to be seized as required by *Article I, paragraph 7* of the *Constitution of New Jersey.* In the course of his complaint, plaintiff Danley described the premises searched as *52* East Main Street (the warrant reads "*54*") but no charge of illegality by reason of that

variance is specifically pleaded. Both plaintiffs allege indictments were procured on the basis of the papers and property seized and add that the State "will rely upon the same at the trial of said indictment and in the absence of the same cannot prove a *prima facie* case under said indictment."

Defendants obtained summary judgment on motion. 43 *N. J. Super.* 303 (*Ch. Div.* 1956). The Appellate Division affirmed, 47 *N. J. Super.* 1 (1957), and plaintiffs are before us as of right because of the constitutional questions asserted.

■ The State concedes the magistrate was without authority to issue a warrant for a search beyond the territorial jurisdiction of his court, *N. J. S.* 2A:8–20, and we think the concession is correct.

■ We find no substance in the second point, that the search warrants were void for want of a statute expressly authorizing them with respect to violations of the gaming statutes. The authority is implicit in the judicial power and is acknowledged in the very provision of the Constitution upon which plaintiffs rely. A different view cannot be found in the circumstance that the Legislature has expressly authorized searches in some situations, largely in aid of regulatory measures not involving criminal liability, such as *R. S.* 4:1–23; *R. S.* 23:4–35; *R. S.* 23:10–20; *R. S.* 26:3–59; *R. S.* 55:11–16; *R. S.* 56:3–25 and 47; or that the Legislature saw fit to regulate searches and seizures in the field of alcoholic beverages, *R. S.* 33:1–56 *et seq.*, wherein we note, parenthetically, that a provision appears for the return of lawful property illegally seized under color of a warrant, *R. S.* 33:1–62, and certain abuses connected with searches are denounced as misdemeanors, *R. S.* 33:1–64 and 65. In *Application of Berlin,* 19 *N. J.* 522 (1955), in which a search warrant in connection with a gaming offense was sustained, no one suggested the issue here tendered, and doubtless because of the common acceptance of the proposition that the power is inherent.

As to the third objection, we fail to understand how the papers and things to be seized could be more explicitly

described. And with respect to plaintiff Danley, if we assume he pleads illegality because of the variance in the street number, it is enough to say that if that claim be correct, it would add nothing decisive to the conceded illegality arising out of the magistrate's lack of authority.

In sum total, for the purpose of this appeal, illegality is clear, but equally clear is the fact that the trooper in good faith attempted to comply with the applicable mandate of the Constitutions, Federal and State, that a magistrate's decision intervene between the police and the search.

█ Plaintiffs recognize that this State has adhered to the rule that proof otherwise admissible will be received notwithstanding illegality of search and seizure. *State v. Alexander,* 7 *N. J.* 585, 594 (1951); *certiorari* denied, 343 *U. S.* 908, 72 *S. Ct.* 638, 96 *L. Ed.* 1326 (1952); *State v. Lyons,* 99 *N. J. L.* 301 (*E. & A.* 1923); *State v. Merra,* 103 *N. J. L.* 361 (*E. & A.* 1927); *State v. Cortese,* 104 *N. J. L.* 447 (*E. & A.* 1927) affirming 4 *N. J. Misc.* 683 (*Sup. Ct.* 1926); *State v. Guida,* 119 *N. J. L.* 464 (*E. & A.* 1938), affirming 118 *N. J. L.* 289 (*Sup. Ct.* 1937). They contend, however, that the rule is designed to avoid interruption of a criminal trial by collateral inquiries, and hence that a proceeding may be maintained in advance of the trial for the return or suppression of the matters seized. In jurisdictions which exclude evidence obtained by unreasonable search and seizure, an objection at trial may come too late. 2 *Wharton, Criminal Evidence* (12th ed. 1955), § 699, p. 705. See, for example, *Rule* 41(e) of the *Federal Rules of Criminal Procedure,* 18 *U. S. C. A.* Reliance is also placed upon the fact that in several of our cases the denial of an application for the return of the seized property was upheld upon a finding that the search or warrant was lawful, without ruling upon the right to relief if illegality had appeared. *Application of Berlin, supra* (19 *N. J.,* at page 531); *State v. Giberson,* 99 *N. J. L.* 85 (*E. & A.* 1923); *State v. Mausert,* 88 *N. J. L.* 286 (*E. & A.* 1915). But our rule of admissibility does not hinge upon the mode or time of an application to suppress but rather rests upon

a policy decision that competent proof shall be available for the prosecution of the offense notwithstanding illegality in the seizure. *State v. First Criminal Judicial District Court*, 10 *N. J. Misc.* 715 (*Sup. Ct.* 1932); *State v. Black*, 5 *N. J. Misc.* 48 (*Ct. Quart. Sess.* 1926). It was undoubtedly because of this understanding of our cases that this court omitted to adopt *Federal Rule* 41(*e*), cited above, when our rules of court were promulgated.

Our rules being silent as to procedure, we pass the adjective aspect with, however, the observation that it is contrary to our basic thesis to parcel a controversy among several trial courts. An application to the court in which the indictments are pending is the course which here would have been consonant with our approach. We nonetheless accept the meritorious issue, as did the Appellate Division. That court reviewed the subject exhaustively and concluded that, although it believed illegally seized proof should be suppressed, the issue should be settled by us.

The leading advocate of the exclusionary doctrine is the United States Supreme Court which ruled for federal purposes that evidence seized in violation of the Fourth Amendment must be returned or suppressed upon suitable application. *Weeks v. United States*, 232 *U. S.* 383, 34 *S. Ct.* 341, 58 *L. Ed.* 652 (1914). In *Wolf v. People of State of Colorado*, 338 *U. S.* 25, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782 (1949), the court held the Fourth Amendment applicable to the states by way of the due process clause of the Fourteenth, but that the rule of exclusion "was not derived from the explicit requirements of the Fourth Amendment" but rather "was a matter of judicial implication" and as such is not binding upon the states. The court added, however, that it had "no hesitation in saying that were a State affirmatively to sanction such police incursions into privacy it would run counter to the guaranty of the Fourteenth Amendment." (338 *U. S.* at *page* 28, 69 *S. Ct.* at *page* 1361). The court has declined to interfere with a state prosecution notwithstanding a claimed violation of the Federal Civil Rights Act, 42 *U. S. C. A.*, § 1981 *et seq. Stefanelli v.*

*Minard,* 342 *U. S.* 117, 72 *S. Ct.* 118, 96 *L. Ed.* 138 (1951); *cf. Irvine v. People of State of California,* 347 *U. S.* 128, 74 *S. Ct.* 381, 98 *L. Ed.* 561 (1954).

The *Weeks* case unsettled confidence in the rule of admissibility, but a majority of the states, many after searching reconsideration, has retained it. *Wolf v. People of State of Colorado, supra* (338 *U. S.* at *page* 29, 69 *S. Ct.* 1359, 93 *L. Ed.* 1782); Annotation 50 *A. L. R. 2d* 531, 535 (1956).

*Article* I, *paragraph* 7 of our *State Constitution of* 1947 repeats the earlier guaranty of the *Constitution of* 1844, in turn borrowed from the Fourth Amendment. At the Constitutional Convention of 1947, an amendment was proposed:

"Nothing obtained in violation hereof shall be received into evidence."

The issue was debated, with specific reference to the merits of the federal rule. One delegate added that in any event he questioned the advisability of incorporating an answer either way in organic law. The amendment was defeated by a vote of 46 to 25. 1 *Convention Proceedings Record,* 598, 608. We do not infer that the delegates intended thereby to embed our case law, but it is equally clear that the rule of exclusion is not the unmistakable wake of the constitutional provision. Had the Constitution decided the issue, we would not concern ourselves with the utility or consequences of the decision. The question, however, being unresolved by either the Federal or State Constitutions, we must strike a balance between the contending interests.

The guaranty is agreed to be one of the great imperatives of a decent society. It stands between the citizen and a police state. The quarrel centers about the need, appropriateness, and efficacy of the exclusionary rule. The force of the pros and cons is reflected by the sharply divided and spirited views among the courts and academic writers. 8 *Wigmore, Evidence* (3d ed. 1940), § 2183 *et seq.; McCormick, Evidence* (1954), § 137 *et seq.*

The exclusionary rule rests upon two propositions. The first is that government should not stoop to the "dirty business" of a criminal in order to catch him. The second is that civil and criminal remedies against the offending officer are as a practical matter ineffective, and hence the rule of exclusion is the only available remedy to protect society from the excesses which led to the constitutional right.

On the other side, many considerations are aggregated. The issue arises only when the evidence is incriminating and thus, in its immediate impact, the rule of exclusion benefits only the guilty. Unlike the extorted confession, to which an analogy is frequently drawn, the evidence illegally seized is not the fruit of official wrong; it is the criminal's own work product which could have been seized lawfully and used against him. If such evidence and "the fruit of the poisonous tree" are suppressed, "The criminal is to go free because the constable has blundered." *People v. Defore,* 242 *N. Y.* 13, 150 *N. E.* 585, 587 (*Ct. App.* 1926), *certiorari* denied, 270 *U. S.* 657, 46 *S. Ct.* 353, 70 *L. Ed.* 784 (1926). Two wrongs go unpunished, at the expense of society. 8 *Wigmore, supra,* § 2184, *p.* 40. Unlike the Federal Government for which the exclusionary rule was conceived, the states must contend with many more crimes of violence. The stakes are different.

It is further argued that the federal rule has been denied its logical sweep, *People v. Defore, supra; comment,* 58 *Yale L. J.* 144 (1948), thus evidencing its unwisdom, 8 *Wigmore, supra,* § 2184a, *p.* 41. For example, the federal courts will not apply their rule if the constitutional right invaded was not that of the defendant (but see *United States v. Jeffers,* 342 *U. S.* 48, 72 *S. Ct.* 93, 96 *L. Ed.* 59 (1951)), or if the infraction of the Fourth is by a state officer acting independently of a federal representative (this latter proposition at the moment is an open question, *Benanti v. United States,* 355 *U. S.* 96, *n.* 10, 78 *S. Ct.* 155, 2 *L. Ed.* 2d 126 (1957)). The evidence may be used on cross-examination if the defendant's direct testimony invites contradiction.

*Walder v. United States,* 347 *U. S.* 62, 74 *S. Ct.* 354, 98 *L. Ed.* 503 (1954).

The most serious criticism is that the exclusionary rule has led to a myriad of minute and vague distinctions, enveloping with uncertainty an area in which enforcement officials must know what they may and may not do. *State v. Mara,* 96 *N. H.* 463, 78 *A.* 2d 922 (*Sup. Ct.* 1951). "Even as to the substantive rule governing federal searches in violation of the Fourth Amendment, both the Court and individual Justices have wavered considerably." *Irvine v. People of State of California, supra* (347 *U. S.* at *page* 134, 74 *S. Ct.* at *page* 384, 98 *L. Ed.* 561).

And lastly, it is urged there is no persuasive evidence that the constitutional guaranty fares better in jurisdictions which embrace the federal rule. *Irvine v. People of State of California, supra* (347 *U. S.* at 135–137, 74 *S. Ct.* 381); *Grant, "Circumventing the Fourth Amendment,"* 14 *So. Cal. L. Rev.* 359 (1941). The refusal of a majority of the United States Supreme Court to apply the exclusionary rule to the states is itself suggestive of doubt as to the soundness of the rule in the area of state responsibility.

The return or suppression of evidence of crime is not a remedy, in a strict sense, of the constitutional wrong. It would protect the victim against the aftermath, but would not compensate him for the invasion of his privacy. Nor are property rights as such in issue on the application; defendant does not seek to recover property for its intrinsic value, but rather seeks to bar the use of it or secondary testimony with respect to it as evidence against him. Hence the exclusionary rule has the role of a deterrent—a device to compel respect for the guaranty by removing an incentive to disregard it. It is calculated to prevent; not to repair. The postulate is an enforcement official indifferent to basic rights. Thus in *Wolf,* Mr. Justice Frankfurter stated the question to be "[h]ow such arbitrary conduct should be checked" (338 *U. S.* at *page* 28, 69 *S. Ct.* at *page* 1361, 93 *L. Ed.* 1782) and referred to the exclusion of evidence as a "way of deterring unreasonable searches" (338 *U. S.*

at *page* 31, 69 *S. Ct.* at *page* 1362). Mr. Justice Douglas, dissenting, described the exclusionary rule as the only "effective sanction" (338 *U. S.* at *page* 40, 69 *S. Ct.* 1359). Mr. Justice Murphy, dissenting, spoke of "a positive deterrent to police and prosecutors tempted to violate the Fourth Amendment" (338 *U. S.* at *page* 42, 69 *S. Ct.* at *page* 1370). Mr. Justice Rutledge, also dissenting, agreed "the Amendment without the sanction is a dead letter" (338 *U. S.* at *page* 47, 69 *S. Ct.* at *page* 1368).

In the debate of the issue the guaranty is pitted against "dirty business." The issue was stated in *People v. Defore, supra* (150 *N. E.* at *page* 589):

"On the one side is the social need that crime shall be repressed. On the other, the social need that law shall not be flouted by the insolence of office."

The same hypothesis is implicit in the analogy to the extorted confession and the further analogy to the federal treatment of a violation of its wire-tap statute. The analogies are not always apt. The extorted confession invariably involves contempt for constitutional right, and the wire-tap necessarily involves a willful violation of a criminal statute. An illegal search and seizure, on the other hand, does not inevitably import conscious illegality. On the contrary, there may be no purpose to flout the Constitution, but only a failure in good faith to stay within the complex rules relating to search and seizure. It is one thing to condemn the product of an arrogant defiance of the Constitution; it is another to impose the sanction when the official intends to respect his oath of office but is found to be mistaken, let us say, by the margin of a single vote.

If the sanction is needed, it would seem to be fitting when there are echoes of the odious writ to search everywhere for anything, or other affronts to the concept of ordered liberty. If the purpose is to protect the guaranty against intentional disregard, why go beyond that target? Surely a breach of the intricate rules of search and seizure under or without a warrant cannot be equated with insolence in office. If a

wider sanction is justified, it can only be on the uncertain ground that anything less would be inadequate or unworkable.

As matters now stand, a state may select all, part or none of the exclusionary doctrine. Maryland, for example, legislated the exclusionary rule as to some misdemeanors except in certain portions of that state, but continued the rule of admissibility as to felonies and the misdemeanors excepted. *Salsburg v. State of Maryland,* 346 *U. S.* 545, 74 *S. Ct.* 280, 98 *L. Ed.* 281 (1954). In South Dakota, after its court adopted the federal rule, the legislature restored the rule of admissibility where the search is made under the color of a warrant. *State v. Lane,* 82 *N. W. 2d* 286 (*S. D. Sup. Ct.* 1957). Alabama legislated the exclusionary rule in the narrow area of offenses against the liquor laws. *Annotation,* 50 *A. L. R. 2d* 531, 555 (1956). Our Legislature, as stated above, spoke to a limited extent in the alcoholic beverage law. *R. S.* 33:1–62.

California switched to the exclusionary doctrine by one vote. *People v. Cahan,* 44 *Cal. 2d* 434, 282 *P. 2d* 905, 50 *A. L. R. 2d* 513 (*Sup. Ct.* 1955). The case involved "deliberate, flagrant acts in violation of both Constitutions and the laws enacted thereunder." The court referred to the criticism of the subsidiary rules concerning unreasonable search and seizure developed by the federal courts and expressly reserved to itself the adoption of workable principles. In footnote 4, the court recognized that unreasonable searches and seizures

"may involve only minor intrusions of privacy or result from good-faith mistakes of judgment on the part of police officers. There is no reason, of course, why, if the exclusionary rule is adopted, appropriate exceptions could not be developed to govern these latter situations. On the other hand, deliberate, flagrant violations of the constitutional guarantees like those in the present case and in *Irvine v. People of California,* 347 *U. S.* 128, 74 *S. Ct.* 381, 98 *L. Ed.* 561 may be as dangerous to ordered liberty as the coercion of confessions. (See, *Allen, Due Process and State Criminal Procedures,* 48 *Nw. L. Rev.* 16, 26–27)."

See *"Two Years with the Cahan Rule,"* 9 *Stanford L. Rev.* 515 (1957).

Before we overturn or depart from the long-standing rule of admissibility we should be convinced of the necessity, utility and workability of another approach. The judiciary, of course, is not the sole guardian of the Constitution. The executive branch is equally sworn to uphold it. That the executive here did respect the guaranty is evident. The trooper did honor the constitutional mandate that a magistrate's judgment intervene between the police and the search. The judgment of a magistrate did intervene, albeit the wrong magistrate. In this case we find neither "dirty business" nor any need for the sanction of exclusion to discourage it. If events should indicate an appreciable disposition in our State to flout the guaranty, we would not hesitate to seek a solution. The question may well await a more exciting set of facts.

Plaintiffs do allege that "for many years last past the State of New Jersey and its law enforcement officers, including attorneys general and county prosecutors and specifically the defendants herein, has affirmatively sanctioned, practised and encouraged unlawful, unwarranted, unjustifiable and unconstitutional police incursion into the privacy of the citizens of said State and law enforcement officials including the defendants have been encouraged to and have themselves encouraged others subordinate to them and under their jurisdiction and control to take advantage of unconstitutional and unlawful searches." We agree with the Appellate Division that this charge is a mere assembly of generalities, devoid of specific content. At the oral argument we invited particularization, but nothing emerged to justify the probable purpose of the pleader to wedge into the area in which the Federal Supreme Court indicated in *Wolf* that it would intervene. At any rate, plaintiffs are not victims of the program they vaguely allege. It is not asserted that the trooper selected the wrong magistrate to obtain warrants he knew the proper magistrates would have refused.

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.